## MERSHON et al. v. SPRAGUE SPECIALTIES CO.

No. 3233.

Circuit Court of Appeals, First Circuit.

Aug. 23, 1937.

As Modified on Denial of Rehearing Oct. 5, 1937.

C. Blake Townsend, of New York City (Drury W. Cooper, of New York City, and Robert Cushman, of Boston, Mass., on the brief), for appellants.

Vernon M. Dorsey, of Washington, D. C. (Alan F. Garner, of Washington, D. C., and James R. Hodder, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

MORTON, Circuit Judge.

This is an appeal by the plaintiffs in a patent suit from a final decree holding two patents invalid and dismissing the bill. The patents sued on were No. 1,141,402 for "Electrolytic Apparatus Employing Filmed Electrodes" dated June 1, 1915 on an application filed June 19, 1913, expired since suit was brought; and No, 1,784,674 for "Film Formation and Operation of Electrolytic Condensers," and other apparatus, dated December 9, 1930, on application filed July 14, 1923. In each the patentee is Ralph D. Mershon, one of the present plaintiffs; the other plaintiff and its predecessors have been for many years licensees under both patents.

Before the present suit was brought a similar one was instituted by the same plaintiffs against a different defendant (O'-Neill) in the Eastern District of New York. The Sprague Company, the present defendant, undertook the defense of that suit as the manufacturer of the apparatus in question. On final hearing both patents were adjudged valid and infringed. The present suit against the Sprague Company was then filed in the District of Massachusetts. Judge Lowell held that the Sprague Company was estopped by the New York decree and issued an injunction against it without considering the merits. The New York decree was later reversed on procedural grounds not affecting the merits. Mershon v. O'Neill, 73 F.(2d) 68 (C.C.A.2). We thereupon reversed the Massachusetts decree, 73 F.(2d) 379; and

314

the present suit went to final hearing and to the decree appealed from.

The apparatus involved is an electrolytic condenser for use in radio sets; and the defendant's device is alleged to infringe both patents in suit. The defenses are invalidity of the patents for lack of invention, and noninfringement.

A condenser consists essentially of two conducting surfaces separated by an insulator or dielectric. Before the development of radio apparatus there was no important commercial use of them. The condensers used on the early receiving sets were made of sheets of tin foil or similar metal insulated by paper. These have now been superseded at certain points by electrolytic condensers. The advantage of the latter is that by reason of the thinness of its insulating film it has enormous capacity, and it also has the peculiar property of curing a puncture—it is "self-healing"—while paper condensers once perforated become useless.

In considering the questions of priority or anticipation which are involved, it is to be borne in mind that Mershon was unquestionably the first to develop and manufacture a practical electrolytic condenser of commercial type. There is no evidence of any such apparatus having been built and sold commercially under any of the patents alleged to be anticipations of those in suit, nor that any such condensers were sold commercially before those made under the Mershon patents. The defendant was in the condenser business, making paper condensers. It did not put out any electrolytic condensers until 1930 about seven or eight years after the plaintiff's condensers had been put on the market and three years after they had achieved marked commercial success. Before undertaking the manufacture of electrolytic condensers, the defendant endeavored to arrange for a license under the Mershon patents. When the attempted arrangements for it fell through, the defendant went ahead without a license. It employed persons who had worked for the plaintiff; it used practically the same process as the plaintiff in forming the film; it put out apparatus substantially identical with that put out by the plaintiff, differing only in size and in certain minor points. There is no room for doubt that, when the defendant started to make electrolytic condensers, it was endeavoring to break into a field which had been developed over a number of years entirely

by Mershon and his licensees, nor that the apparatus which the defendant then put out was closely imitative of the apparatus then being made by the plaintiff. We recently said of a somewhat similar situation:

"But today the defendants, though denying its validity, pay tribute to the novelty and utility of the plaintiff's patent by manufacturing and putting on the market devices embodying every element in each of the four claims here in issue." Bingham, J., Casco Products Corporation v. Zaiger (C.C.A.1) 93 F.(2d) 210.

See, also, Trico Products Co. v. Apco-Mossberg Corporation, 45 F.(2d) 594, 598 (C.C.A.1). A defendant is not to be criticized for doing what it had a legal right to do. Patents are not unlimited grants; they are grants of carefully stated fields for limited periods, and the intention is that outside the field claimed or after they have expired the public shall be free to use the invention. But the fact that the defendant has closely copied the patentee's device leaves the defendant small room to question the utility of the device or the practical advance which it made in the art. As was said in a leading case:

"The prior art was open to the rubber company. That 'art was crowded,' it says, 'with numerous prototypes and predecessors' of the Grant tire, and they, it is insisted, possessed all of the qualities which the dreams of experts attributed to the Grant tire. *And yet the rubber company uses the Grant tire. It gives the tribute of its praise to the prior art; it gives the Grant tire the tribute of its imitation, as others have done.*" (Italics supplied.) McKenna, J., Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 434, 435, 440, 441, 31 S.Ct. 444, 450, 55 L.Ed. 527.

This is very applicable to the case before us.

As to the validity of the first patent: The patented device considered as a condenser depends on an anode of filmed aluminum. Long before Mershon entered the field it was known that aluminum and certain other metals, when connected to the positive side of an electric current and immersed in certain solutions, acquired a surface film which had extraordinary characteristics. It is very thin, the thickness being measurable only by reference to the length of light waves; it is highly insulating to the passage of current from the aluminum into the electrolyte, but allows current to pass freely from the elec-

trolyte into the aluminum; if a certain critical voltage is exceeded, the whole film breaks down instantly and completely and allows current to flow freely from the metal into the electrolyte; if punctured at one point by excess voltage, the film instantly heals itself on the voltage being reduced. The principle on which it acts is unknown; and the whole art is entirely empirical. Slight and apparently unimportant changes may have important results. The practical usefulness of such apparatus was greatly impaired by the fact that the film was destroyed by moderately high temperatures, whch were unavoidable in actual use. Mershon discovered and patented, before the patent in suit was applied for, a process of forming a film of this sort which would be heat-resistant. (No. 1,012,889 dated December 26, 1911, application filed January 5, 1910; French patent 423,598 April 21, 1911.) It appears to have been an invention of real merit for which at the time when it was made there was but slight industrial use. These two patents are prior art as to the patents in suit.

Three quite different uses for such filmed aluminum were early recognized: (1) Its property of permitting current to pass in one direction but not in the other made it available as a rectifier for alternating current; (2) its property of letting go suddenly and completely when the critical voltage was exceeded made it useful in lightning arresters; and (3) its dielectric quality made it available for condensers on currents not exceeding the critical voltage. It is this last use with which the present case deals.

In using electrolytic cells as condensers, the positive wire of the direct current with which they are used is connected to the filmed aluminum plate, the negative wire to the electrolyte. Connected in this way, the cell passes no current, practically speaking. The film serves as an extremely thin insulator between the aluminum plate on one side and the electrolyte, which serves the purpose of a plate, on the other side. In using the film for this purpose very different considerations of design, arrangement, and function are involved from those which have to be considered in rectifiers or in lightning arresters.

In modern radio apparatus the operating current is customarily taken from the public lighting and power circuits which are almost universally of alternating character. It is necessary that this alternating current be rectified; i. e. converted into direct current flowing in one direction. This is done by rectifying apparatus. The direct current as it leaves the rectifier is not even and uniform; it has waves which if uncontrolled make a hum in the reproduction. To eliminate this hum condensers are employed. They may be thought of as devices for storing up the peak of each wave and feeding it back into the circuit, so that an even current is produced and the hum is eliminated,— to some extent at least. When the demand for efficient condensers arose, about 1927 or a few years earlier, the Mershon condenser was the only one which was satisfactory. As early as 1923 Prof. Pupin, the distinguished electrician who was then working on radio problems for the Navy, told Mershon that, if Mershon had such a condenser as he said he had, it would be a great boon for radio. Pupin bought and used some of the early Mershon instruments. The plaintiff contends, not without some justification we think, that the Mershon condenser was one of the essential factors in making possible the present development of radio receiving sets. It was adopted by the large manufacturers, and in the four years following 1927 between three and four million were sold.

The first patent in suit is of narrow character. After describing the heat-resistant film which is covered by the earlier patent, it says:

"I have discovered that while electrodes having the heat-resistant films described above can be advantageously used in any electrolyte, in an electrolytic condenser, rectifier, lightning arrester or other apparatus, they do not evidence to the fullest extent their remarkable property of withstanding high temperatures unless they are used (1) in the identical solution, originally acidulated or unacidulated, in which the films were formed or subjected to the heat-treatment; or (2) in some other, but acidulated, electrolyte. That is, if the films are not used in the identical electrolyte of their formation or heat-treatment, then whatever electrolyte they are used in must be acidulated. *It is this discovery that forms the subject of the present application for Letters Patent.* In the appended claims I have

used the term 'an original electrolyte' to mean the first electrolyte or its equivalent, an acidulated electrolyte." (Italics supplied.)

The single claim of this patent in suit reads as follows:

"5. An electrolytic condenser comprising a containing vessel; aluminum electrodes therein, coated with heat-resistant electrolytic films; and an original electrolyte in the vessel, containing borax and .a free acid."

By a disclaimer subsequently filed the acid was restricted to inorganic acids. This is a combination claim comprising three elements: (1) A containing vessel; (2) film-coated aluminum electrodes; and (3) the electrolyte described. The defendant strongly contends that this claim shows no invention; that it is nothing but the aluminum electrode of the expired Mershon patent put to an obvious use; that acidulated electrolytes containing borax were old in the art in this connection; and that the patent in suit is a transparent effort to get further monopoly of an invention which had been fully patented. The last contention is obviously unfounded. At the time when the application for this patent was made and also when the patent issued, the great demand for electrolytic condensers for radio apparatus was far in the future.

The defendant in its discussion of the prior art groups condensers, rectifiers, and lightning arresters. All three devices make use of the filmed aluminum but in very different ways. They are mentioned in the patent, as above quoted, although it does not appear.to have had any commercial success except as applied to condensers. Without undertaking to repeat the elaborate discussions of the prior art contained in the opinion of the court below against the patent and in that of Judge Byers in favor of it (Mershon v. O'Neill [D.C.] 3 F.Supp. 26), to which reference is made, it may be said that concededly it does not show the combination of this claim. There are suggestions of an electrolyte containing borax and acidulated with acid of inorganic character, but they are theoretical and indefinite in character, not discriminating between what works commercially, and what does not work. They afford a basis for experimentation, and information which might be of great value in solving the problem, but the successful device is not there. The prior art was essentially

a paper art without a single instance in it of apparatus which was suitable for the uses to which the Mershon condenser was applied. The fact that the defendant with the old art to draw on put out a copy of the plaintiff's device proves that there is something about this device both of novelty and of excellence.

Moreover, all the prior art now cited against this patent was considered in the Patent Office before the patent issued. In such a subtle and difficult art as that in which this patent lies more than usual weight is to be given to the Examiner's judgment. It is not to be set aside unless it is clearly wrong, and under such circumstances it is difficult to establish clear error. Wisconsin Alumni Research Foundation v. George A. Breon & Co., 85 F.(2d) 166, at page 167 (C.C.A.8); Nordberg Mfg. Co. v. Woolery Machine Co. (C.C.A.) 79 F.(2d) 685, at page 687; Trane Co. v. Nash Engineering ‘Co., 25 F.(2d) 267 (C.C.A.1). The Mershon patent of 1911 and his French patent on the same invention are *process* patents by no means pointing the way to the definite successful apparatus of the patent in suit. It is urged that this result could be reached by patient experimentation in the light of what was already known. The District Judge so regarded it, disagreeing in this respect both with‘the Patent Office and with Judge Byers in the New York case. This principle applies when it is obvious that the concrete thing which is desired can be attained by a rearrangement of mechanism or mechanical or chemical elements. The Mershon patent was not a step of that character. Mershon clearly had in mind a much better condenser than anybody had yet achieved; he worked toward it and finally accomplished it, not by methodically running through all possible combinations,—considering the subtleties involved the number of such combinations would be almost infinite,— but by what amounted to inventive touch or insight. The strongest argument against this patent is that it consists simply in applying the heat-resistant film to an obvious use in an obvious way. The use was perhaps obvious. But the way which the patent points out, precise, definite, successful, not found specifically in any prior art, was we think not obvious. While it is difficult for persons not familiar with this intricate and obviously difficult field to say with certainty whether the step taken in the Mershon patent involved the exercise of

the inventive faculty, we are not prepared to say that it did not or that claim 5 of the first patent is not valid. The facts on which this question is to be determined are not in controversy. We think the conclusion of the District Judge as to this patent cannot be sustained.

The defendant further contends that it does not infringe this claim. The principal argument on this point is that the claim calls for aluminum *electrodes,* while the defendant's construction has only one such electrode. In the use of the Mershon apparatus as a condenser the essential thing, as has been said, was the dielectric property of the film, around which the condenser is built. In such use the opposite electrode from the aluminum plate serves to bring the current into the electrolyte around the film. Whether this function is performed by another electrode inserted into the electrolyte or by the conducting wall of the containing cell seems to us a pure matter of construction, one arrangement is the equivalent of the other for this purpose. Both devices operate in the same way on the same principles. "There is a substantial identity, constituting infringement, where a device is a copy of the thing described by the patentee, 'either without variation, or with such variations as are consistent with its being in substance the same thing.' * * *. Except where form is of the essence of the invention, it has little weight in the decision of such an issue; and, generally speaking, one device is an infringement of another 'if it performs substantially the same function in substantially the same way to obtain the same result.'" Sanford, J., Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 41, 42, 50 S.Ct. 9, 12, 74 L.Ed. 147. We conclude that claim 5 of this patent is valid and infringed.

The second patent in suit also relates to electrolytic condensers, rectifiers, lightning arresters, etc. It is based on an alleged discovery that the material of which the containing vessel and incidental parts of the apparatus are made may affect its operation. Mershon states that he discovered that contamination of the electrolyte by certain metals "poisoned" the condenser. Rather curiously lead proved the worst metal in this respect, but other common metals also had the same deleterious effect. With respect to some of them they were dissolved by the electrolyte when there was no current in the condenser and when current was applied they were plated out by it and deposited on the container. After this had been done, the condenser operated properly. In the case of lead, however, once the poisoning had taken place it persisted,—a curious problem in electro-chemical or molecular physics. In the course of his investigations Mershon discovered that copper did not affect either the films on the aluminum electrodes or the operation of the condenser. He accordingly made his containing vessel of copper. In the patent the apparatus shows two sets of three plates each composed of filmed aluminum suspended in an electrolyte in a copper can. It was designed for use on alternating currents. When current flows *from* the electrolyte into the. filmed aluminum plate it is likely to injure the film for condenser purposes. To avoid this Mershon arranged as part of the apparatus a circuit of continuous direct current the positive of which was connected to the aluminum anode. Essentially the apparatus shown in the patent is an electrolytic condenser, applicable to *alternating* currents in which direct current from an independent source is used to keep positive pressure on the filmed aluminum electrodes. In radio receiving sets the condensers are used on a *direct* current. For this use the construction of the patent is greatly simplified. There is only one, or one set of, aluminum electrodes. The direct current on which the condensers are used serves to keep the aluminum electrodes positively electrified; and the secondary current which is shown in the patent is omitted as unnecessary. The electrolyte and the copper container are the same. The defendant's device is substantially a copy of the plaintiff's; we understand the differences but regard them as immaterial to the discussion. This greatly simplified form of the condenser, though not shown in the drawings of the patent, is clearly brought within the scope of it by the tenth and twelfth claims:

"10. An electrolytic condenser comprising a copper tank, an electrolyte therein, and an anode of -filming metal immersed in the electrolyte."

"12. An electrolytic condenser having an electrolyte and susceptible of being harmfully affected by the presence of lead in the electrolyte, an anode of filming metal in the electrolyte, and a condenser member of copper in contact with the electrolyte."

The defendant's first contention is in effect that these claims were improvidently

granted at a late stage in the passage of the patent through the Patent Office and that their meaning and scope are cut down by the abandonment of certain other claims which were rejected by the Examiner. Claims 10 and 12 are, however, simple and explicit. It is not a question of construing doubtful language, in which case the defendant's position would have much force. The claims were allowed by the Examiner in connection with his disallowance of the other claims. The subject matter of the rejected claims was in no case identical with that of the claims in suit. We think that claims 10 and 12 must be accepted at their face value as part of the patent.

There remains the very difficult question whether these claims are valid in view of the prior art. The characteristics of filmed aluminum electrodes, and that they could be used in condensers or rectifiers or lightning arresters, were at this time well known. Various types of electrolyte were also known at the time when this application was filed in 1923. As the plaintiff's expert, Waterman, testified, the only new feature in these claims was the copper can. Apparently many different factors have to be considered in designing an instrument of this character (1) the electrolyte must be one which will cause a film on the aluminum when current is applied; (2) it must not attack the film when the condenser stands idle; (3) it must have sufficient electrical conductivity to pass sufficient current to form a suitable film and to repair punctures; (4) it must not corrode the container either when the instrument is in use or stands idle; (5) it is desirable that the container be of conducting material serving as a cathode but it must be of a material not attacked by electrolytes which do not attack the film. Copper had been tried in containers for rectifiers and would not stand up. Mershon appears to have discovered that this failure was caused only by the flow of current *from* the copper into the electrolyte. As copper met the other requirements, it followed that it was a suitable material for containers of condensers if such counter current was avoided. This is the discovery or observation on which these claims rest. As stated, it seems simple, but the final result was obscured by the fact that most of the common metals will not work in this combination. Mershon's investigation of this matter appears to have been the first. The prior art does not show the combination of these claims.

■ Generally speaking, the mere substitution of one material for another will not amount to invention even when the new material is more effective. Apart from the electro-chemical questions involved, the substitution of a copper container serving as a cathode for a glass container and a separate metal cathode would certainly not constitute invention. Copper was an obvious material for the containers. If we accept as a fact that the prior experience with it in rectifiers and with other electrolytes had led to the general belief in the art that it was unsuitable for use as a container for electrolytic condensers with any type of electrolyte, a simple trial would show that this general impression was wrong. It does not seem to us that the thought of trying copper for containers and the successful trial of it for that use amounted to invention. It was no more than testing the accuracy of the general impression. If the copper container had changed the action of the condenser in any substantial way, very different considerations would be involved. We are of opinion that claims 10 and 12 are void for lack of invention.

■ With respect to infringement of the other claims we think that the "nui-directional current" (claims 5 and 8), or "uni-directional component of voltage and current" (claims 13, 14, and 16), or the "exciting current" in claim 15, each refer to an element not present in the defendant's device. As has been said, the device shown in the patent in suit contemplates two currents of electricity, the principal current on which it is used and a secondary current used to maintain the positive voltage on the filmed anode. This secondary current is an element in the claims in which it is referred to. It is not present in the defendant's device. That the uni-directional current in which the condenser is used serves the same purpose as the separate uni-directional current of the patent is not, we think, sufficient to bring the defendant's device within the claims which specify this element. These claims clearly relate to an apparatus of two separate circuits as shown in the drawings. In our opinion these claims are not infringed.

The decree of the District Court is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion; the appellants recover costs of appeal.

**WILSON, Circuit Judge.**

I am unable to agree with the conclusions of the majority opinion except as to the second patent in suit. The first patent in suit relates to electrolytic apparatus employing filmed electrodes and describes the process of forming a dielectric film on aluminum electrodes with an original electrolyte containing borax and a free acid in a containing vessel.

In this patent only claim 5 is in issue, No. 1,141,402, which originally read as follows: "5. An electrolyte condenser comprising a containing vessel; aluminum electrodes therein, coated with heat-resistant dielectric films; and an electrolyte in the vessel, containing borax and a free acid, said free acid being liberated during the formation of said films or added to the electrolyte."

The plaintiff Mershon amended this claim by striking out the last phrase so it, as amended, read as follows: "5. An electrolytic condenser comprising a containing vessel; aluminum electrodes therein, coated with heat-resistant electrolytic films; and an original electrolyte in the vessel, containing borax and a free acid."

Many years afterward the plaintiff Mershon acknowledged that this claim was too broad and restricted the claim in question, so that the free acid mentioned was an inorganic acid.

Having disclaimed as to a part of his claim in the patent in suit, the presumption of validity of the patent is lost, since the Examiner does not pass on the claim as restricted by a disclaimer which shifted the burden of proving the validity of the claim to the plaintiffs, which the District Court found they had not done.

In suits in equity, facts found by the trial court are accepted by this court unless shown to be clearly wrong. I think the District Court was warranted in finding that the first patent was invalid on the testimony of the witnesses for the defense, especially in view of the prior art and its teachings, and the testimony of the witnesses for the defense which the District Judge evidently believed and to which he gave weight.

Between the opposing testimony of plaintiffs' expert, Waterman, and the defendant's expert, Kleinschmidt, the District Court may have found that of Kleinschmidt to be entitled to greater weight, especially when coupled with that of the defendant's other witnesses, together with the teachings of the many prior patents in this art that had been issued both here and abroad on the construction of condensers and the process of constructing a filmed aluminum anode.

In any event, I think the French patent No. 423,598 of Mershon, obtained in 1911, clearly discloses or implies all the elements of the first Mershon patent in suit, and was issued more than two years prior thereto, and from its teachings the Mershon apparatus described in claim 5 could be readily constructed by any one skilled in the art. Under section 4886, Rev. St., as amended by Act March 3, 1897 (35 U.S.C.A. § 31) it seems to me to be conclusive on the issue of anticipation so far as the process of making the filmed electrode of the plaintiff Mershon, which constitutes the principal feature of his apparatus under claim 5 of the first patent. Minerals Separation North American Corporation v. Magma Copper Company, 280 U.S. 400, 402, 50 S.Ct. 185, 74 L.Ed. 511; Alexander Milburn Company v. Davis-Bournonville Company, 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651.

There appears to have been a wealth of experiments in the prior art in addition to Mershon's French patent in the process of forming a heat-resistant film for use in condensers, particularly in the British patent issued to Pollak in 1898, No. 18,956, and the patent issued to Zimmerman, No. 1,074,231, though the demand for such condensers was limited until the need about 1927 for a rectifier and condenser in the common house radio set.

Mershon's French patent No. 423,598 clearly disclosed the process of making a heat-resistant film for use in condensers. The only addition in claim 5 of the Mershon patent in suit, No. 1,141,402, is a "containing vessel," which is clearly implied in the description in his French patent of a process for making such a film for use "in a condenser."

As the court said in Minerals Separation North American Corporation v. Magma Copper Company, supra, 280 U.S. 400, at page 402, 50 S.Ct. 185, 186, 74 L.Ed. 511: "The question is not what is the precise scope of the claims in 835120, but what is disclosed in the specification and made known to the world."

While the French patent of Mershon was on a process for forming a dielectric

film, it is evident from the description of the process that it was for use in electrolytic apparatus and condensers.

The opening sentence of his application is: "It is well known that the action of electrolytic condensers, rectifiers, and similar devices depends upon the coating or film which may be formed upon the surface of the aluminum, tantalum, magnesium and other metals when they are immersed in certain electrolytes and subjected to the action of the electric current."

He further says in his descripton of the process: "Thus, if a *condenser,* for example, is to operate at a temperature as high as 60°C., the forming temperature would be preferably from 90° to 120°C., thus affording ample margin between the operating temperature and the highest temperature at which the film is operative." (Italics supplied.) This described a heat resisting film.

And again: "With a cathode of filming material this cathode will be attacked little if any if the electrolyte used is acidulated but will be more strongly attacked if the electrolyte be unacidulated. In the latter case the performance of the *condenser* electrodes so filmed will be a little better if they are operated in the identical electrolyte or in any acidulated electrolyte." (Italics supplied.)

Was it invention to claim in claim 5 of the patent in suit "An electrolyte condenser comprising a containing vessel; aluminum electrodes therein, coated with heat-resistant dielectric films; and an electrolyte in the vessel, containing borax and a free (inorganic) acid"?

The description in the French patent mentions borax and boric or phosphoric acid as the electrolyte and obviously described a heat-resistant dielectric film.

The only addition in the patent in suit is a "containing vessel" which was, of course, essential in any use of the process. I think the process described in Mershon's French patent disclosed or implied all the essentials of his electrolytic apparatus described in his patent in suit. The addition of a containing vessel did not disclose any invention. Any one skilled in the art could readily make up a dielectric coated electrode immersed in electrolyte such as described in the patent in suit in a containing vessel.

On Petition for Rehearing.

PER CURIAM.

On further consideration of this case on the petition for rehearing, a majority of the court are of opinion that Mershon's French patent constitutes an unescapable anticipation of claim 5 of the patent in suit. The views on that point originally stated in Judge WILSON'S dissenting opinion are adopted as the views of the court. It follows that our decree reversing the District Judge was erroneous and should be vacated and that an order should be entered affirming the decree of the District Court with costs in this court.

The petition for rehearing filed September 9, 1937, is denied; the decree of August 23, 1937, is vacated; and the following decree is entered: The decree of the District Court is affirmed, with costs to the appellee.