UNITED SHOE MACHINERY CORPORATION

v.

INDUSTRIAL SHOE MACHINERY CORP.

Civ. A. No. 61–798.

United States District Court
D. Massachusetts.

Nov. 26, 1963.

H. L. Kirkpatrick and Martin Kirkpatrick, Fish, Richardson & Neave, Boston, Mass., for plaintiff.

Joseph Zallen, Boston, Mass., for defendant.

WYZANSKI, District Judge.

### A. INTRODUCTION

1. This is a suit for infringement of three patents owned by United involving toe lasting machines as used in the shoe manufacturing industry: Patent No. 2,926,367, relating to a power assisted toe lasting machine; Patent No. 2,986,-753, relating to an upwiping composite Teflon-steel toe band for such a machine; and Patent No. 3,061,852, directed to a wiper operated trimming knife for such a machine.

2. Defendant asserted three counterclaims.

3. The first counterclaim challenges the validity of all the claims of all three patents in suit.

4. The second counterclaim is directed to alleged issues of unfair competition and was dismissed on plaintiff's motion during the trial.

5. The third counterclaim is directed to alleged anti-trust issues and was also dismissed on plaintiff's motion during the trial.

6. Two types of machines made by defendant are charged to infringe each of the three patents in suit, namely, the Industrial Power Attachment on the United LM–6 Lasting Machine and the Industrial Shirley Lasting Machine.

7. The defenses interposed by defendant are, in general, invalidity and non-infringement as to each of the three patents in suit.

## B. THE TOE LASTING OPERATION

1. A toe lasting machine of the type with which the present controversy is concerned is a machine which can be manipulated by an operator to perform a series of forming operations in which the toe end of the shoe upper and lining are drawn upwardly tight over and around the toe end of a last and over the marginal portion of the insole mounted on the inverted wooden last on which the shoe is made. The edge of the upper is then attached, usually by quick setting cement, to the shoe insole previously fastened to the bottom of the last. The toe lasting operation requires a skilled operator who observes and feels the shoe upper on the last as he forms and tensions the upper by means of the lasting instrumentalities, such as the wipers and toe band. Thus, the shoe upper and lining will be properly conformed to the curved side and end surfaces of the toe end of the last in order that the tension or stress on the shoe upper will be evenly distributed around the toe end of the last and the upper and lining will be smooth and free from wrinkles when the last is removed.

2. The major steps in the toe lasting operation, which are carried out by the lasting instrumentalities as they are moved relatively to the upper and last (with the last supported in fixed position in the toe lasting machine bottom upward and with the upper and its lining extending upwardly therebeyond around the toe of the inverted last), are upwiping, overwiping, and bedding down.

3. The upwiping step is performed by the operator pressing a foot treadle to move the wipers or toe band upwardly around the toe of the shoe to wipe the surface and so pull the upper around the toe of the last up to the level of the insole.

4. The overwiping step is next performed by the operator moving the wipers by the hand lever in the plane of the last bottom from the toe end of the last (after applying an adhesive) while continuing to press the wipers against the upper to force its edges inwardly into contact with the insole, the wiper mechanism operating meanwhile to close the wipers.

6. The final bedding down step is performed by moving the closed wipers overlying the upper and insole downwardly to press the overwiped edges of the upper firmly against the insole for a time sufficient for the cement therebetween to set.

7. The three patents in suit all involve various aspects of toe lasting machines used for performing these operations:

—the first patent relates to power assist features which reduce physical effort while retaining discretion in the operator for operation of the machine to advantage in lasting shoes;

—the second patent provides a toe band which replaced the steel wipers for upwiping;

—the third patent provides a trimming knife for automatic trimming of excess stock at the toe of the shoe as it was gathered between the wipers during overwiping.

## C. THE POWER ASSISTED TOE LASTING MACHINE OF PATENT NO. 2,926,367

1. The LM–6 toe lasting machine has been used in the trade since as far back as World War I, that is, about half of a century. One of its characteristics is that its action is wholly under the control of the operator who can exercise discretion in operating the machine to accommodate widely varying types. Thus, on any given shoe, a skilled operator might repeat portions of the upwiping step and at least the initial portion of the overwiping step sequentially as well as alternately as his experience tells him is necessary properly to form the upper around the last. This ability is particularly important in the usual shoe factory operations in which the uppers prepared for the toe lasting operation are not as uniform as might be desired.

2. However, the LM–6 machine requires considerable physical effort to operate, especially insofar as the final stage

of the overwiping operation and the bedding operation are concerned.

3. Although this undesirable aspect of the LM–6 machine had long been recognized in the trade, United, until it was effectively challenged by a competitor, did nothing to introduce commercially an improvement to reduce the operator's physical effort.

4. As revealed by United's own intra-office memoranda, (see, for example, Exs. U–147A par. 2, U–148 par. 2, U–156 par. 2, U–160 par. 7–8, and U–170), United's active interest in power-assisted toe lasting machines was greatly stimulated when in 1955 a competitor, Kamborian, put on the market a semi-automatic toe lasting machine, which was covered by Kamborian patent No. 2,668,967, and which was improved in Kamborian Model D advertised July 11, 1956.

5. United in a memorandum dated November 27, 1956, Ex. U–170, p. 6, recognized that "the particular novelty involved in the Kamborian—Model D machine clearly resides in the use of power (fluid pressure) means for operating the wipers of a Bed Lasting Machine, i. e., advancing and closing the wipers for overwipe and effecting relative heightwise movement of the wipers and the toe end of a shoe for upwiping and for bedding, with these power movements under the direct (servo-feed-back) control of a single control member, i. e., the handle H." At the same time United was aware that there were in the prior art at least 8 patents disclosing bed type lasting machines in which the wipers are operated by fluid under pressure with manual control (Ibid, p. 4) and 5 patents providing an arrangement wherein a single control member is effective to control the direction, speed and extent of movement of two different fluid pressure operated pistons by the direction, speed, and extent of movement of the control member in two different directions. (Ibid, p. 5).

6. Fully aware of the Kamborian competition and of the patent situation, United's ordinary mechanics, skilled in the art of making shoe machinery, set out to develop a machine which would not infringe Kamborian's patents. Their alleged invention has four claimed features: (1) Power Assist for Overwipe; (2) Power Assist for Bedding Down; (3) Continued Bedding Down; and (4) Wiper Head Locking.

7. The first of these claimed features provides discretionary power overwiping in a toe lasting machine having conventional steel toe lasting wipers, together with manual means for moving them including a foot treadle for effecting relative heightwise movements of the wipers and a shoe on a support, and a hand lever for effecting advancing and closing movements of the wipers longitudinally relatively to the shoe. The overwiping by power, more particularly fluid pressure, includes means for effecting the advancing and closing movements of the wipers by a power overwiping cylinder, together with means under the direct control of the operator, more particularly a control member mounted on the hand lever, for selectively rendering the power operated means operative to effect advancing and closing movements of the wipers and the shoe at any time during relative movement of the wipers and the shoe by the manual means.

8. With this arrangement the operator, at his own discretion, may at any time during the lasting operation and at any position of the wipers, bring the power means into operation for advancing and closing the wipers, continue this power operation for as long as he desires, or terminate the power operation and restore manual action, as he himself wishes.

9. Claims 3 and 4 and claims 17, 18, 19, and 20 are all concerned with the discretionary power assist overwiping feature of the patent.

10. The second claimed feature of the patent involves the concept of providing discretionary power bedding down in a toe lasting machine having conventional steel toe lasting wipers, together with manual means for operating them including a foot treadle for effecting relatively heightwise movements of the wipers relatively to the shoe. The discretionary

power bedding down is provided by power operated means, more particularly a power bedding down cylinder for effecting said relative heightwise movement of the shoe in one direction (the bedding down direction), together with means under the direct control of the operator, more particularly a control member mounted on the hand lever for selectively rendering said power operated means operative to effect its particular relative movement of the wipers and the shoe (in the bedding down direction) at any time during relative movement (in the overwiping direction) of the wipers and the shoe by the manual means.

11. With this arrangement, the operator at his own discretion, at any time during the lasting operation and at any position of the wipers relatively to the shoe, may bring the power operated means into operation for applying bedding down pressure, continue this bedding down action for as long as he desires, or terminate the bedding down action and restore manual operation, exactly as he himself wishes.

12. Claims 3, 4, 9, 10, 11, and 12 are all concerned with the discretionary power assist bedding down feature of the patent.

13. The third claimed feature of the patent involves the concept of providing discretionary continued power bedding down in a toe lasting machine having toe wipers, means, more particularly a foot treadle, for effecting relative heightwise movements between the wipers and a shoe support in one direction to cause the wipers to wipe the upper materials heightwise around the toe end of the last and in the opposite direction for pressing the lasting margins of the upper materials against the bottom of an insole on the last, and, means, more particularly a hand lever for effecting advancing and closing movements of the wipers longitudinally relatively to the shoe on the support to wipe the lasting margin of the upper materials inwardly over the bottom of the insole. Fluid pressure operated means, including a power bedding down cylinder, is provided for effecting

relative heightwise movement between the wipers and the shoe on the support in the last mentioned direction (the bedding down direction) for causing the wipers to press the lasting margin of the upper materials firmly against the bottom of the insole after they have been wiped inwardly thereover by the wipers. The fluid pressure operated means includes a valve for admitting fluid under pressure to said fluid pressure operated device and a manually actuatable control device for the valve arranged upon actuation by the operator to render the fluid pressure operated means operative to effect said heightwise movement and to continue the operation of the fluid pressure operated means until the manually actuatable control device is again actuated.

14. This feature makes it possible for an operator to cause the wipers of the toe lasting machine to apply continued bedding down pressure to the overwiped lasting margin of the upper materials, without any attention on his part and for so long a period as he desires.

15. Claims 25, 26, 27, 29, 30, and 31 are concerned with the continuous bedding down feature of the patent.

16. The fourth claimed feature of the patent involves the concept of providing a wiper heightwise lock in a toe lasting machine for locking the wiper head on which the wipers are mounted for advancing and closing movements longitudinally relatively to a shoe on a support, the wiper head being mounted for movement heightwise relatively to the support to cause the wipers to wipe the upper materials around the toe end of the last. Manual means in the form of a hand lever is provided for advancing the wipers, and manual means in the form of a foot treadle is provided for effecting the heightwise movements of the wiper head. The wiper heightwise lock includes power operated, more particularly fluid pressure operated, locking means operable to resist heightwise movements of the wiper head, and means under the direct control of the operator

designated as a heightwise locking control for rendering the locking means operative to resist heightwise movement of the wiper head as the upper materials are wiped inwardly over the bottom of the insole on the last by the wipers as they are advanced and closed.

17. This feature facilitates the toe lasting operation by making it possible for the operator readily to stop and easily to hold the wiper head at any point in its heightwise movements.

18. Claims 33 and 34 are concerned with the heightwise lock feature of the patent.

## D. PATENTABILITY OF PATENT NO. 2,926,367

1. Patent 2,926,367 itself admits, as United's own internal memoranda had also shown, that the shoe machinery art had long encompassed manually controlled power operated means for power operated means for effecting both the heightwise movements and the closing movements of the wipers. Here it will be sufficient to refer to Pym, Patent No. 2,098,358 and Pym, Patent No. 1,693,119.

2. United's internal office memorandum, Ex. U–170 p. 6, asserts that "our arrangement differs from both the prior art and the Kamborian machine in that *separate control members*, i. e., the Rotary Handle H and the Push Button B are provided for controlling, respectively, the operation of the power assist for overwiping and the operation of the power assist for bedding." And United's own expert, Mr. Ryan (R. 498–500) agreed with that memorandum, though he did add that United's disclosure "also has a control for locking the heights * * * and continued bedding at the operator's discretion." But surely such small steps could be devised by any mechanic and are, in any event, at least foreshadowed in Pym, Patent No. 2,-098,358, p. 1, lines 28–63.

3. On United's own testimony, Patent No. 2,098,358 is not a significant step in advance of the prior art.

■■ 4. There is no substance to the suggestion, based on General Electric Co. v. DeForest Radio Co., D.Del., 23 F.2d 698, 705, that United's toe lasting machine represents the long sought solution of a problem which had defied a satisfactory answer. There is no impressive history of decades in which United's eager, driving energy sought to supply a power-assisted toe lasting machine. On the contrary, United, a giant not tempted to display maximum resourcefulness and initiative, did nothing important until Kamborian produced a competitive machine. United's many experiments thereafter were principally to find ways of rivalling Kamborian without being found liable for infringement. All that United did was to produce an alleged invention that hardly goes beyond a handle, a button, and a lock.

■■ 5. Moreover, there is no basis in the evidence for concluding that an immediate and widespread demand for the machine disclosed in the patent proves that the machine constituted an invention. In the first place, no machine precisely corresponding with the claimed invention was ever marketed by United. And, in the second place, even if United succeeded in getting a large market for a new product its success is not necessarily to be attributed chiefly to the technical advance which a new product represented. To make such attribution would be improper unless inquiry were made whether United enjoyed a dominant market position, or indeed a monopoly position, whether United has a peculiar legal or economic position facilitating the exchange of new machines for old machines out on lease, whether United has furthered the introduction of its new machine by adopting unusual pricing policies when faced with competition, and whether other factors reflect something less than perfect competition in the shoe machinery industry. Cf. United States v. United Shoe Machinery Corp., D. Mass., 110 F.Supp. 295. Kaysen, United States v. United Shoe Machinery Corporation. An Economic Analysis of an Anti-Trust Case. The facts shown in that antitrust case are not before this Court; but this Court on the record in

this case has no ground to assume that United's successful sales or leases were made in a market in which there were many equal competitors and a quite fluid situation. The burden is on United to show that there is such a competitive market if United seeks to have this Court use the volume of its sales as the basis for inferring the originality of its products.

■ 6. All the claims of Patent No. 2,926,367 are invalid for want of invention.

## E. THE COMPOSITE TEFLON-STEEL TOE BAND OF PATENT NO. 2,986,753

1. The Teflon-steel toe band of Patent No. 2,986,753 is of simple construction. It is a composite structure with a resilient metal backing strip with a low-friction plastic facing having a narrow operating edge. In the preferred embodiment the low-friction plastic is Teflon, triangular in cross-section.

2. For many years, upwiping had been carried out on toe lasting machines such as the LM–6 machine by means of a pair of steel wipers. Teflon had been available for over a decade before the invention. Steel strip backings had been utilized for many years. No one had put them together in the precise combination shown and claimed in the patent.

3. Upon its introduction to the trade by plaintiff in 1960 and 1961 in its PTL–B machine, the patented toe band immediately went into use, causing replacing of substantially all of plaintiff's PTL–A machines, to the extent of over a thousand PTL–B machines.

## F. PATENTABILITY OF PATENT NO. 2,986,753

1 United's own internal memorandum of March 24, 1959, Ex. U–191, R. 505, gives an unanswerable demonstration of the invalidity of Patent No. 2,986,753:

"As to the use of "Teflon" in place of leather or other similar materials previously used for the operative facing of a toe band, in view of the known physical characteristics of this new material, especially its low coefficient of friction and its relative softness, it does not seem to the writer that the use of this material for the facing of a toe band involves anything more than a judicious selection of materials. In the latter connection, it may be noted that the use of a celluloid facing for a toe band has already been proposed, see the aforementioned Search Memo."

This statement is not received as an admission binding on plaintiff. It is merely an accurate, brief, and sharply-pointed statement summarizing the facts which are on record in this Court.

2. No one familiar with the history of shoe machinery would be likely to say that the act of selecting Teflon and flexible steel backing for a flexible toe band represented an "act of selection * * * beyond the capacity of commonplace imagination", to use the test Judge L. Hand enunciated in B. G. Corporation v. Walter Kidde & Co., 2nd Cir., 79 F.2d 20. Such an experienced person would be familiar with not only leather toe bands supported by steel spring backings, but also Teflon toe bands supported by chains or metal clips. (R. 423, 418).

3. Nor can claims 9 and 10 of this patent be saved by noting that there the disclosure includes a narrow operating edge provided by a triangular cross section of the Teflon facing. No special significance to this limitation is revealed by the patent itself. The testimony of United's expert, Mr. Ryan (R. 58), that the triangular cross section provides the necessary clearance for the shoe, leaves this Court with the firm conviction that if such a narrow operating edge offers advantages, the step necessary to procure such advantages would have been fully evident to any ordinary mechanic with minimum skills in the art of manufacturing shoe machinery.

■ 4. All the claims of Patent No. 2,986,753 are invalid for want of invention.

## G. THE WIPER OPERATED TRIMMING KNIFE OF PATENT NO. 3,061,852

1. In women's shoe styles with highly pointed toes, the shoemaking problem is that, after upwiping, excess stock gathers at the toe of the shoe to such an extent and concentration that it must be removed before overwiping.

2. The wiper operated trimming knife of the invention of this patent functions automatically during the overwiping step, without attention from the operator, eliminating entirely any separate step for performing a cutting function, and so increases an operator's production rate, as well as the uniformity of the shoes produced.

3. The patent shows a trimming knife which is detachably secured to the mid portion of an equalizing bar which is connected by links to the wiper carriers, the forward movement of which advances and closes the wipers to perform their overwiping operation. The trimming knife of the patent has a forwardly extending flat portion, the front end of which is formed with bevel faces recessed in V-shape. The inner surfaces of the wipers on their insole contacting surfaces are rabbeted to provide guide means for the knife. One surface of the knife, as shown in the patent, is in a plane with the insole contacting surfaces of the wipers, with the cutting edge of the knife spaced from the bottom face of the insole by the thickness of the knife. The knife of the patent, then, in addition to its trimming function, as well provides a wiping action. Thus, the trimming knife of the invention is connected to and functions as a part of the powered wiper operating mechanism of the toe lasting machine for movement with, between, and ahead of the wipers during their advancing and closing movement automatically to trim excess upper material gathered at the toe end of the shoe and wipe upper material beneath it as it advances. During overwiping, the in-gathering of the marginal stock of the upper centrally and at the extreme toe end of the shoe during the early closing of the main wipers sets up the unwanted excess material generally in the form of protruding folds or plaits much larger than along the sides of the toe end, to be severed by the oncoming cutting edges of the trimming knife. As the wipers continue advancing and closing to complete their overwiping movement, the trimming knife is projected forwardly of the wipers to wipe inwardly of the edge of the shoe bottom the remaining trimmed marginal material.

## H. THE PATENTABILITY OF PATENT NO. 3,061,852.

1. The prior art includes a number of knives used in toe lasting machines or the like.

2. Morey, Patent No. 469,972 shows a pair of trimming knives movable toward each other at the sides of the toe end of the shoe some distance from the extreme toe end of the shoe to trim surplus material from the upper just ahead of the wipers to produce an even surface upon which to lay an outer sole. It is true that Morey's knives could not, without adaptation, be used in lasting shoes having highly pointed toes. But the moment that the ultimate consumers (that is, the women purchasers of shoes at retail) effectively demanded shoes with highly pointed toes, and knives were needed to cut the excess stock which gathers at the point of a highly pointed toe during manufacture, any artisan of average skill could adapt the Morey knives to the new need.

3. Lund, Patent No. 1,382,006 also could be readily adapted. It discloses a trimming knife for trimming off folds or plaits formed in the overlasted margin of the upper in the overwiping operation. The knife extends across the entire width of the toe end of the shoe and is operated after the wipers are partially backed off from a fully closed position by a separate hand lever to exert a wedging final ironing down pressure against the margin of the upper and to trim off the upstanding plaits to provide a flat seam for an outsole.

834

4. Even more easily, a person of average skill in the art, to meet the new need, could rely upon minor modifications of Kamborian, Patent No. 2,668,967. That shows a trimming knife operating in a guideway of the wiper support. The cutter is disposed immediately below the wipers of the machine and the handle is provided for operating the trimming knife manually at the end of the over-wiping operation to trim away surplus upper material for the reception of an outsole. To be sure, Kamborian's trimming knife is operated manually. But the step of making the operation automatic reflects nothing but a routine combination of familiar elements, and would occur readily to anyone trained in designing shoe machinery.

5. The differences between Patent No. 3,061,852 and the prior art are, in the words of 35 U.S.C. § 103 "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art" of manufacturing shoe machinery.

■ 6. All of the claims of Patent No. 3,061,852 are invalid for want of invention. All of the claims reflect "a patent for a combination which only unites old elements with no change in their respective functions." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162.

## I. "A CROWDED ART"

1. Plaintiff seeks to avoid the aforesaid conclusions with respect to each of the three patents by noting that each is directed to a machine in a crowded art, and that, according to some older precedents, e. g., Greenwald Bros. Inc. v. Enochs et al., 3rd Cir., 183 F. 583, 585 and Robertson Rock Bit Co. v. Hughes Tool Co., 5th Cir., 176 F.2d 783, 791, under such circumstances smaller advances than might otherwise be required satisfy the test of patentable invention. One justification given for the doctrine is the metaphor of Judge Evans in Universal Oil Products Co. v. Globe Oil and Refining Co., 7th Cir., 137 F.2d 3, 7 that "an invention in a crowded art may be like a fertilizer on exhausted soil." That unfortunately chosen metaphor, quite apart from the earthy picture and sense of smell it evokes, implies that garden varieties of improvement constitute patentable invention. Such a lowering of the constitutional standard finds no support in recent Supreme Court cases. But see In re Tamarin, 187 F.2d 160, 163, col. 2, 38 CCPA 872; Application of Hummer, 241 F.2d 742, 744, 44 CAPA 814, Deller's Walker on Patents, 1962 Cumulative Supplement, pp. 44–51.

■ 2. Perhaps this is as good a case as any for courts to reject the "crowded art" doctrine. Here we have three typical combination patents granted in the art of manufacturing shoe machinery, an art in which, so far as this record shows, there have been few fundamental inventions in the last half century, and in which the skilled artisans have been concentrating on trivial re-arrangements of old elements. While no doubt the Patent Office has issued thousands of combination patents related to this art, the patents here in suit and the prior art patents both show only slight advances achieved by what shoemakers and judges alike must appropriately call the "pedestrian" efforts of average machinists.

3. Many of the artisans who are skilled in shoe machinery are employed by the dominant large-scale machine shop company in the business of manufacturing shoe machines. Many other skilled artisans are chiefly concerned to erect a blockade, or perhaps a toll barrier, against that company. Sometimes toll has been exacted by the company; sometimes from it. And in encouraging these exactions internal to the shoe machinery industry, the Patent Office has had a tendency to overlook the larger public interest in making "resources freely available to skilled artisans." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, at page 152 of 340 U.S., at page 130 of 71 S.Ct., 95 L.Ed. 162.

4. Indeed it may be asked whether the "crowded art" doctrine, by unwarrantably extending the legitimate area of patent protection for inventions, has not been at the root of some of the most serious antitrust problems of the nation, such as those perceptively analyzed in Kaysen, United States v. United Shoe Machinery Corporation, An Economic Analysis of an Anti-Trust Case. Nothing in Professor Kaysen's book constitutes evidence in this case; but that is no reason for judges to be unmindful of the economic and legal consequences of a judicial doctrine. The courts took no evidence when they invoked the "crowded art" rule to lower the standards of invention. The courts need take no evidence to revoke their own judicially-created rule. It is enough to say that no substantial consideration, except encrusted error, favors the "crowded art" doctrine.