UNITED SHOE MACHINERY CORPO-
RATION, Plaintiff, Appellant,

v.

INDUSTRIAL SHOE MACHINERY COR-
PORATION, Defendant, Appellee.

No. 6281.

United States Court of Appeals
First Circuit.
July 15, 1964.
Rehearing Denied Aug. 20, 1964.

H. L. Kirkpatrick, Boston, Mass., with whom Edgar H. Kent and Martin Kirkpatrick, Boston, Mass., were on brief, for appellant.

Joseph Zallen, Boston, Mass., for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This is an action by United Shoe Machinery Corporation, United, against Industrial Shoe Machinery Corporation, Industrial, for infringement of three patents, Nos. 2,926,367; 2,986,753, and 3,061,852, relating to toe lasting machinery. The district court found all three patents invalid and, without making findings as to infringement, entered a judgment of invalidity on Industrial's counterclaim, and dismissed the complaint. United appeals.

■ It is sometimes preferable for a trial court to pass on infringement as well as validity, not only to enable an appellate court to determine the action finally, but also, if lack of infringement is clear, perhaps to decide the case ultimately on this narrower issue. We make no present generalizations on this matter, but cf. Hap Corporation v. Heyman Manf. Co., 1 Cir., 1963, 311 F.2d 839, 844, cert. den. 373 U.S. 903, 83 S.Ct. 1290, 10 L.Ed.2d 198. United makes a more specialized objection with respect to the court's failure to decide questions of infringement because it invokes the principle that immediate and successful copying lends evidentiary support to the claim of validity. See Mershon v. Sprague Specialties Co., 1 Cir., 1937, 92 F.2d 313, 316, cert. den. 304 U.S. 561, 58 S.Ct. 943, 82 L.Ed. 1528. Again we voice no comment because, on our view, the principle is inapposite.[1] We pass directly to the issue of validity.

Toe lasting is an operation requiring a series of steps. In sum, the material which will constitute the outside of the toe, known as the upper, is placed around the toe end and over the toe lining and the marginal portion of the insole mounted on an inverted wooden last and the edges partially attached to the insole, usually by a quick-setting cement. The first step is the upwiping (the wooden last being upside down) of the material around the toe; the next is the overwiping, or inwiping, over the edge of the insole, and the final step is bedding down. Bedding down is the flattening out and fastening of the overlapped material to the insole. Normally there must also be a trimming off of the central portion of the overwipe, which bunches, and accordingly will not completely bed. As to some shoes, particularly women's with highly pointed toes or delicate uppers, the operation as a whole is far from routine. In the words of the district court,

"[t]he toe lasting operation requires a skilled operator who observes and feels the shoe upper on the last as he forms and tensions the upper by means of the lasting instrumentalities, such as the wipers and toe band. * * * in order that the tension or stress on the shoe upper will be evenly distributed around the toe end of the last and the upper and the lining will be smooth and free from wrinkles when the last is removed. * * * [O]n any given shoe, a skilled operator might repeat portions of the upwiping step and at least the initial portion of the overwiping step sequentially as well as alternately as his experience tells him is necessary properly to form the upper around the last. This ability is particularly important in the usual shoe factory operations in which the uppers prepared for the toe lasting operation are not as uniform as might be desired." 223 F.Supp. 826, at 828.

Patent No. 2,926,367 relates to a power-assisted toe lasting machine which sought to supplement the advantages of a manual (i. e., human-powered) machine, on which an operator could exercise the "feel" necessary to do the careful work thus described, by supplying controlled power in such a way that it could reduce

1. Copying, like commercial success, is irrelevant except in close cases. Cf. Mc- Cord Corp. v. Beacon Auto Radiator Co., 1 Cir., 1952, 193 F.2d 985, 989.

the expenditure of physical effort without undue interference with the operator's individual skill. The control achieved was such that the operator could engage or disengage the power at will and could hold temporarily in any position one set of wipers while he was operating, manually or otherwise, the others. A more comprehensive description of the device and its accomplishments will be found in the opinion of the district court, supra, 223 F.Supp. at 829–831. After making these findings the court stated, "United's many experiments * * were principally to find ways of rivalling Kamborian [an earlier machine] without being found liable for infringement. All that United did was to produce an alleged invention that hardly goes beyond a handle, a button, and a lock." It added, a matter we will return to, that evidence of commercial success was not to be considered because of certain circumstances peculiar to United, and failed to comment upon Industrial's alleged copying. It concluded, "On United's own testimony, Patent 2,-926,367, is not a significant step in advance of the prior art," but merely "small steps [that] could be devised by any mechanic."

 In our opinion this was a considerable undercharacterization both of the testimony and of the device. A court undoubtedly may, on its own, draw the conclusion that certain advances are within the knowledge or ability of ordinary mechanics skilled in the art, but we question, in the absence of affirmative evidence enabling the court to put itself in the position of such persons, whether its own judicial competence may extend beyond a relatively narrow area. This area is well illustrated by the second patent, discussed infra. One may wonder, however, whether a court, unaided by any expert testimony, can find that a machine which, although of relative complexity, is claimed to be of improved simplicity, and which was produced only after several months of apparently intensive efforts and some fifteen or twenty attempted "combinations," was a matter of obviousness to "any mechanic." The changes were hardly only "a handle, a button, and a lock," although if they were we might agree with United that this did not negative originality. But passing purely mechanical factors, we do not find the '367 device within the teaching of the prior art. The prior art shows manual devices, and power devices, and manual devices convertible at will to power. However, on examination it shows none of the high degree of discretion here possessed described in detail in the court's findings, supra.

Perhaps the best approach would be to discuss the two Pym patents referred to by the court, No. 1,678,873 (inadvertently numbered 2,098,358) and No. 1,693,119, both of which were power operated with manual control. The '873 device could be made to function either forward or in reverse, at the will of the operator, but by a single control. Its mechanically interdependent cams permitted no selection over the sequence of operations. No wiping could be performed manually. The '119 device, which employed friction clutches, and was required to be belt-driven, did permit independent control of the upwipers and the overwipers. However, like the '873 patent, it was solely power operated, and with no "hold" which permitted retention of what had been accomplished with one set of wipers while the operator went ahead or back or resumed operations with the other. Neither of these devices, which the court regarded as "foreshadowing" the '367 patent, nor any of the six others it merely referred to without discussion,[2] possessed the scope and flexi-

2. Six other patents, with largely automatic power operation, were asserted by Industrial's counsel as anticipating or teaching United's device. No witness so testified. Only one of them was listed on the '367 wrapper. In an area as identifiable as a toe laster it could not be that so many patents were inadvertently overlooked, and it seems significant in the light of this testimonial silence that the Patent Office representatives qualified in this field did not regard them as sufficiently relevant even to cite.

bility (the ultimate objective of all power-assisted machines) of United's device. Moreover, it may be noted that none ever proved commercially acceptable.

United was the first to devise a combination machine whereby the three lasting operations could be separately performed with full discretionary, and a locking, power assist that permitted selective repetition "sequentially as well as alternatively." That this was a substantial advance is shown not only by undisputed testimony, but by the evidence of commercial acceptance.[3]

The court stated that United filled no long-felt want, and might have developed this device at any time, but was slothful because of its comfortable monopoly position. Even if the court was correct as to monopoly and sloth, which, on the record, is open to question, Kamborian was not slothful. Yet when he decided to enter this field he not only did not follow any of the expired patents (including the two Pyms) referred to by the court, but apparently did not learn from them what, allegedly, they taught United and, when appellee entered this area, it essentially (see fn. 3, supra) followed United rather than the prior machines.

On this record we find valid those claims designated by United to be infringed.[4] As to infringement, the district court not having passed upon this issue we will not do so ourselves in the first instance, except to state that United's claims do not strike us as per se untenable.

▬▬ The 2,986,753 patent presents a different situation. The invention here,

if any, is an upwiper, sometimes called a toe band, composed of a plastic known as Teflon backed by a strip of spring steel that can be formed in a V and bent by hand to correspond roughly with the toe of the particular shoe being lasted. The Teflon is described as having a narrow operating edge, so that its cross-section shows as slightly triangular. Teflon is a firm material, but its surface has a low coefficient of friction and, accordingly, will not damage the most delicate uppers. The prior art showed wipers of plain steel, of plain Teflon, of leather and some other substances backed by steel, and of Teflon backed by steel linkage. Although the properties of Teflon were well known, and it had been used as above for perhaps a decade, no one had realized what proved to be the highly beneficial result of combining steel, which would hold a shape, with Teflon, which, unless so backed, would not. Even so we do not believe that every previously undiscovered combination of known materials possessing known qualities should be patentable because the combination proves particularly efficient, especially if it is along lines already recognized.[5] Cf. Lincoln Stores, Inc. v. Nashua Mfg. Co., 1 Cir., 1946, 157 F.2d 154, 162, cert. den. 329 U.S. 811, 67 S.Ct. 623, 91 L.Ed. 692. Nor was there invention in using a strip of Teflon of a graded thickness. There was nothing novel in the use of a slightly angular wiper, see, e. g., Jorgensen Patent 2,324,-509, July 20, 1943.[6] In Jorgensen this was achieved by the shape of the backer, see, e. g., p. 8 of the Patent, col. 1, but shaping the filler would seem an ob-

---

3. Since we need draw no greater conclusions from this success we do not consider further the court's finding that the acceptance was not entitled to the usual weight because of special circumstances relating to United's behavior and its position in the industry. Regardless of such circumstances we do not see how United could have marketed what was essentially these machines if they did not function advantageously. (By using the word "essentially" we are not to be taken as invading the issue of equivalency between United's patent and the alleged infringing devices.)

4. Claims 3, 4, 9, 10, 11, 12, 17, 18, 19, 20, 25, 26, 27, 29, 30, 31, 33 and 34. The court also found invalid claims which were not alleged by either party to be infringed or copied. We vacate that finding, also, but without making the contrary finding.

5. There is also a suggestion in the testimony that the special advantages of Teflon backed by steel had not been demanded until the recent advent of highly pointed shoes.

6. The Jorgensen patent was not reproduced in United's record appendix. How-

 

vious equivalent. United's device falls far below its case of Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721. It could not be rescued by evidence of even wide commercial acceptance and slavish imitation. We hold, however, that the court should not have determined invalid claims 1–6. This is not because the court did not have power to do so under the pleadings, see Hap Corporation v. Heyman Manf. Co., op. cit. supra, but because Industrial affirmatively told the court that these claims were not in the case. As to them the judgment should be silent.

The third patent, No. 3,061,852, is for a power-operated, automatically activated trimming knife and wiper, designed to cut off the excess, or bunched, material on the toe insole as it is being bedded down. There is nothing novel in the V-shaped, or "bird-mouth" knife, as any asparagus grower would testify. We agree with the district court that this device was within the teaching of the prior art, or at least not notably beyond it. Power activated tandem knives operating in connection with the wipers had been long known. So far as appears, the bunching of the excess overwiped material on the insole in an area that could be encompassed by a single knife came only with the newly fashionable highly pointed shoes. If there was any substantial earlier demand for this device, there was no evidence of it. Nor do we perceive any special accomplishments in mechanics. Even assuming commercial success and the tribute of imitation (which latter is perhaps debatable) we will affirm the finding of invalidity of the litigated claims of this patent.[7] In so doing we need not pass upon the correctness of the district court's allegedly novel views as to "crowded art." Even if the court

may have used, in part, erroneous tests, we feel no enthusiasm for this patent.

Judgment will be entered vacating the judgment of the District Court and remanding the action for further proceedings not inconsistent herewith. Appellant to recover its docket fee and one half of its printing costs in this court.

---

ever, it was introduced by Industrial as an exhibit and, technically, all exhibits are before the court, pursuant to our Rule 22, although, under Rule 23 we have no obligation to examine them unless reproduction has been waived by a court-approved stipulation. Pioneer Credit

Corp. v. Bloomberg, 1 Cir., 1963, 323 F.2d 992. We were led to this exhibit by the file wrapper, also in evidence, although not reproduced.

7. Nos. 1, 2, 5 and 6. The findings as to the others should be vacated.